1
2
3
4
5
6
7   UNITED STATES DISTRICT COURT
    WESTERN DISTRICT OF WASHINGTON
8              AT SEATTLE
9

10  NEWPORT YACHT CLUB, *et al.*,         Case No. C09-0589RSL

11              Plaintiffs,               ORDER GRANTING MOTION FOR
                                          SUMMARY JUDGMENT
12       v.

13  CITY OF BELLEVUE,

14              Defendant.

15
16       This matter comes before the Court on the City of Bellevue's motion for
17  summary judgment. Plaintiff Newport Yacht Club operates a marina on Lake
18  Washington, in the City of Bellevue, that is adjacent to the outflow of Coal Creek, and
19  plaintiffs William and Leanne Weinstein (collectively, the "Weinsteins") own property
20  that straddles the mouth of Coal Creek. In 2003, plaintiffs initiated a federal lawsuit
21  against the City and King County, Washington, alleging violations of the Clean Water
22  Act that arose out of the governmental bodies' alleged faulty design and management
23  of stormwater and sedimentation facilities in the Coal Creek basin. In August 2004,
24  plaintiffs, the City of Bellevue, and King County resolved that lawsuit through
25  settlement. The ensuing Settlement Agreement, approved by the Honorable Thomas
26  Zilly, United States District Judge, is the subject of this action. Plaintiffs claim that in

ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT - 1

the course of performance over the ensuing six years, the City has failed to meet its obligations under the contract in two ways: (1) it failed to adequately implement the Coal Creek Stabilization Plan ("CCSP") and (2) it failed to cooperate in the permitting of certain activities on the Weinstein's property. Defendant disputes those claims, and also seeks summary judgment on its counterclaim that the Weinsteins failed to comply with their obligations under the agreement.

At plaintiffs' request, the Court heard oral argument in this matter on March 22, 2010. For the reasons set forth below, the Court grants the motion.

## I. DISCUSSION

### A. Jurisdiction

The Court's jurisdiction in this matter is limited. In the prior federal action, the court dismissed the case with prejudice; however, it "retain[ed] jurisdiction to enforce the terms and conditions of . . . the Settlement Agreement . . . ." Agreed Order of Dismissal 2 (C03-2534TSZ, Dkt. #86); see Flanagan v. Arnaiz, 143 F.3d 540, 544 (9th Cir. 1998) (jurisdiction may be furnished by a provision retaining jurisdiction over the settlement agreement) (citing Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 378, 381 (1994)). As previously described, therefore, the Court's jurisdiction ends at the four corners of the Settlement Agreement. See July 27, 2009 Order at Dkt. #40.

### B. Standard of Review and Applicable Law

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–50 (1986); Bagdadi v. Nazar, 84 F.3d 1194, 1197 (9th Cir. 1996). The inquiry is "whether

ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT - 2

the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251–52. The moving party bears the burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is in fact a genuine issue for trial in order to survive summary judgment. Anderson, 477 U.S. at 250. The nonmoving party can defeat summary judgment with fact assertions that create a genuine dispute as to any essential element of the moving party's claim. Id.

A settlement agreement is a contract, so the Court applies Washington law to interpret it. See Northwest Acceptance Corp. v. Lynnwood Equip., Inc., 841 F.2d 918, 920 (9th Cir. 1988) (agreement interpreted according to the law of the state where the contract was made); Jeff D. v. Andrus, 899 F.2d 753, 759 (9th Cir. 1990) (agreement interpreted according to contract law of the state in which it sits); see also Settlement Agreement ¶ 17.4 (choice of law provision provides that this agreement shall be "interpreted under the laws of the state of Washington").

In Washington, construction of a contract—the process that determines the legal consequences that follow from a contract term—is a question of law. Denny's Rests., Inc. v. Sec. Union Title Ins. Co., 71 Wn. App. 194, 201 (1993) (citing Berg v. Hudesman, 115 Wn.2d 657, 668 (1990)). Interpretation of a contract, however, is a determination of fact; it is the process that ascertains the meaning of a term by examining objective manifestations of the parties' intent. Id. "Interpretation of a contract provision is a question of law only when (1) the interpretation does not depend on the use of extrinsic evidence, or (2) only one reasonable inference can be drawn from the extrinsic evidence." Go2Net, Inc. v. C I Host, Inc., 115 Wn. App. 73, 75 (2003) (internal citation and quotation omitted).

ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT - 3

**C. Source Control Projects: The Budget Cap**

One of the major provisions of the Settlement Agreement concerns the "Coal Creek Stabilization Project," which is actually a series of projects designed to "address erosion, sedimentation, and flooding issues in the Coal Creek basin." Settlement Agreement, Ex. C (Dkt. #1 at 45). One category of these projects is "source control," encompassing slope stabilization and erosion mitigation along Coal Creek. Id. The parties dispute the amount of money that the City was obligated to spend to complete the source control projects. The Settlement Agreement contains a budget cap; if the City has reached its budget cap, then its obligations under the source control provisions end. This dispute centers on whether the cap includes or is in addition to amounts contributed by King County, which was a party to the Settlement Agreement but is not a party to this enforcement lawsuit.[1]

Exhibit C of the Settlement Agreement represents a list of projects that King County and the City of Bellevue developed to implement the CCSP. The two governmental parties together listed the estimated costs of a number of source control projects, and Exhibit C contains line items for source control projects that add up to a total of $3,075,000. Id. In addition, the body of the Settlement Agreement contains two provisions relevant to the cost of the projects. The first, Paragraph 3.1, is entitled "Coal Creek Stabilization Payment," and reads:

> Within ten days . . . the County shall pay to the City . . . $2,150,000 . . . less a credit for County funds spent on approved work on overbank erosion in Cinder Mine area. This payment represents the County's portion of costs for Coal Creek Stabilization Project ("CCSP") attached hereto as Exhibit C.

Id. ¶ 3.1. The second is entitled "Source Control Budget Cap," and reads:

---

[1] King County used to own Coal Creek Park, one of the relevant parcels of property to the prior federal lawsuit, but transferred the land to the City as part of the Settlement Agreement. (See Settlement Agreement ¶ 2.2.1 (Dkt. No. 1 at 15).)

ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT - 4

> For the "source control" items listed on Exhibit C, the corresponding line item dollar amount represents the maximum amount the City is obligated to expend for that project inclusive of design, permitting, and construction costs but excluding [permitting costs]. The City's charges against the line item budget amounts set forth in Exhibit C shall be limited to reasonable and customary costs for capital improvement projects.

Id. ¶ 4.5. Plaintiffs argue that these provisions operate together to impose a total obligation on the City of Bellevue to pay $5.076 million for the source control projects—up to $3.075 million from its own coffers, and $2.001 million from King County. Plaintiffs' Opposition at p. 12.[2] They point to the language in Paragraph 4.5 that only identifies "the City," and argue that, if $3.075 million were the total cost of the project, including the County's contribution, this paragraph would have limited the amount of money that "the City *and County*" were compelled to pay. Id. at p. 13. The City counters that the cap on the source control projects was only that listed in Ex. C—$3.075 million—and that the $2.001 million paid by the County is subsumed by that number, not added to it. They also point to Paragraph 4.1 of the Settlement Agreement, which explicitly provides that the City is the sole responsible party for implementing the CCSP. Settlement Agreement ¶ 4.1.

Contracts must be interpreted as a whole, so as to give force and effect to each clause. Boeing Co. v. Aetna Cas. & Sur. Co., 113 Wn.2d 869, 876 (1990). Ambiguity should not be read into a contract if the Court can reasonably avoid doing so by reading the contract as a whole. McGary v. Westlake Investors, 99 Wn.2d 280, 285 (1983). In this case, the contract is not ambiguous. As set forth below, the contract language is

---

[2] The numbers merit a brief explanation. Ex. C in the Settlement Agreement lists a total CCSP expenditure limit of $3,775,000 but $700,000 of this total is earmarked for sediment removal; the source control line items, at issue here, add up to $3,075,000. Settlement Agreement, Ex. C. Additionally, the County was obligated to pay the City $2,150,000 (Settlement Agreement ¶ 3.1), but plaintiffs aver that the County received a credit of approximately $149,000 for work done in 2004; thus, the City received in-pocket $2,001,000. Plaintiffs' Opposition at p. 12 n.26.

ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT - 5

1  clear.  Reading the contract terms together, the City and County's payments together
2  are capped at $3.075 million for source control projects.  This is due to the plain
3  language of Paragraphs 3.1, 4.1, and 4.5, and the structure of the Settlement Agreement
4  generally.
5        First, Paragraph 4.1, which identifies the City as the sole party responsible for
6  implementation of the CCSP, is in harmony with the rest of the Agreement.  Nearly
7  every paragraph pertaining to the CCSP only names the City.  For example, the City
8  alone is obligated to interact with plaintiffs by updating them on the progress of the
9  CCSP, working with them to set milestones and schedules, and mediating any disputes.
10  Settlement Agreement at ¶¶ 4.4, 4.7.  The City alone is responsible for obtaining
11  permits from third parties.  Id. at ¶¶ 4.1, 4.3.  King County's obligations ended at the
12  transfer of Coal Creek Park to the City and the deposit of funds for the source control
13  projects.  See id. at ¶¶ 2.2, 3.1, 4.1.  The County was then released; it had no
14  obligations to conduct any projects along Coal Creek.  It is not material, therefore, that
15  the words "and County" are missing from the budget cap paragraph.  The CCSP was
16  the City's to implement; after fulfilling its antecedent obligations, the County simply
17  walked away.
18        Moreover, the County's $2.001 million payment "represents the County's
19  *portion of costs* for [the CCSP]."  Settlement Agreement ¶ 3.1 (emphasis added).
20  "Portion" is defined as "a share or allotted part."  WEBSTER'S THIRD NEW WORLD
21  DICTIONARY 1182 (1988); see also Queen City Farms, Inc. v. Cent. Nat'l Ins. Co., 126
22  Wn.2d 50, 77 (1994) ("[The] meaning [of contract terms] may be ascertained by
23  reference to standard English dictionaries.").  The only construction that the Court can
24  reasonably give to Paragraph 3.1 is that the County's payment was a *part* of the
25  CCSP—and therefore a *part* of the total line item amount in Ex. C, not added to it.  See
26  Mayer v. Pierce County Med. Bureau, Inc., 80 Wn. App. 416, 421 (1995) ("A [contract]

ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT - 6

provision is not ambiguous merely because the parties suggest opposing meanings."). The contract is not ambiguous and is interpretable without the aid of extrinsic evidence.

Even applying the "context rule,"[3] the Court comes to the same result. First, Mr. Weinstein's declaration does not provide relevant context. Instead, the Court must disregard the declaration because it merely sets forth his unilateral subjective intent about the budget cap term. Hollis v. Garwall, Inc., 137 Wn.2d 683, 695 (1999). Plaintiffs' only other evidence of "context" is City employee Carol Helland's reaction to a newspaper article published after the contract was entered into, interpreting the budget cap provision. Helland Dep. at pp. 141–42 (Dkt. #100). A newspaper article written by an unrelated party is not in itself relevant evidence. More importantly, Helland was not a party to the contract, making her interpretation of the Settlement Agreement—even if contradictory—irrelevant for purposes of the *Berg* context rule. Cf. Hollis, 137 Wn.2d at 694 (discussing parties' intent). Rather than relying on the irrelevant extrinsic evidence, the Court finds that the parties' intent is clear based on the language and structure of the agreement.

Defendant carried its burden in demonstrating that the budget cap is $3.075 million by reference to the plain language and construction of the contract. Plaintiffs did not rebut this showing with evidence sufficient to survive summary judgment. Summary judgment is therefore granted as to this issue.

**D. Sediment Capture Volume**

Paragraph 4.2 of the Settlement Agreement provides:

> Increased Sediment Capture Volume: The sediment removal capacity outlined in the CCSP shall be increased by four hundred (400) cubic

---

[3] Washington courts apply the "context rule," which permits a court to look to extrinsic evidence to discern the meaning or intent of words or terms used by contracting parties, even when the parties' words appear to the court to be clear and unambiguous. Hollis, 137 Wn.2d at 696.

ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT - 7

>    yards to a total capacity of one thousand five hundred (1,500) cubic yards at or near the existing I-405 pond or other locations that are acceptable to the City.

Settlement Agreement ¶ 4.2; see also id., Ex. C. It is undisputed that the City has not yet increased any sediment capture capacity. The City argues that its performance has thus far been excused because of the non-occurrence of a condition precedent—the approval of relevant permits by third-party agencies—which it is still in the process of securing.

A condition is an event that must occur, or a circumstance that must exist, in order for the promisor to have any duty to perform. Colorado Structures, Inc. v. Ins. Co. of the W., 161 Wn.2d 577, 588 (2007). Language that establishes a condition precedent can vary. Here, the relevant provision is contained in Paragraph 4.3.1:

>    Contingency: The City's obligation to implement any portion of the CCSP is contingent upon receipt of all required permits and third-party approvals . . .

Settlement Agreement ¶ 4.3.1. This language of contingency makes it abundantly clear that securing the necessary permits and third-party approvals from relevant agencies created a condition precedent. See, e.g., Tacoma Northpark, LLC v. NW, LLC, 123 Wn. App. 73, 80 (2004) (the words "contingent upon" "leave no doubt that at the time of execution the parties intended that no sale would take place until these conditions were satisfied"). It is also undisputed that third-party permits have prevented performance here—and thus that the City's performance is, so far, excused.

Nonetheless, plaintiffs argue that the City's course of action in pursuing third-party permits violated its implied duty of good faith and fair dealing. The City first opted to pursue permits for an in-stream, as opposed to an out-stream, sediment pond to comply with its obligations under the Agreement, and undertook a long series of events, exploratory actions, investigation, and permitting action to create that pond—none of which Plaintiffs dispute. Along the way, the City encountered difficulty in securing

1  third-party permits, which led the City to abandon plans for an in-channel sediment
2  pond in 2009. The City is now pursuing plans for an off-channel pond, including
3  purchasing property from a Bellevue resident on which to build the pond, and filed for
4  the necessary permits on September 1, 2009. Nonetheless, both parties agree that the
5  permitting process may take several years.

6  Plaintiffs ask the Court to find that pursuing an in-stream pond—rather than first
7  seeking to permit an out-stream pond first—violated the City's obligations to fulfill its
8  obligations under Paragraph 4.2 in good faith. The argument appears to be based
9  primarily on plaintiffs' belief that the City should have known that the relevant
10 permitting agencies would have been unfriendly to an in-stream pond. They submit the
11 testimony of Wayne Daley, one of plaintiffs' consultants, who interacted with the City
12 on this subject in 2004 and 2005. Daley declared that he was "surprised" that the City
13 made "such an effort to obtain permits for an in-stream pond during that timeframe"
14 when he thought all parties understood that an in-stream pond would not be permitted.
15 Daley Decl. ¶¶ 8–10 (Dkt. No. 84). Plaintiffs imply that the Court should read into the
16 City's choices a dilatory motive to stymie the process of complying with the Settlement
17 Agreement.

18 This argument fails as a matter of law. The duty of good faith and fair dealing
19 does not impose or inject additional substantive terms into the contract. Badgett v.
20 Security State Bank, 116 Wn.2d 563, 569 (1991). The parties did not contract for a
21 time frame by which permits would be completed—only for one in which the
22 permitting process would commence, and for various City time frames within that
23 process. Settlement Agreement ¶¶ 4.3.2, 4.7.2. The parties also did not contract for the
24 *means* by which the City would pursue its sediment-capture volume project; no term in
25 the Agreement requires the city to construct an out-channel pond, rather than an in-
26 channel pond. The duty of good faith and fair dealing does not inject either term into

ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT - 9

the agreement. It is true that the City must make an effort in good faith to obtain the necessary permits and may not engage in practices in bad faith to prevent permitting, which could hypothetically include long, intentional periods of delay. But Plaintiffs have not raised a material issue of fact that would indicate that the City's actions in pursuing an in-stream pond were made for this purpose. In contrast, the City provided substantial evidence that an in-stream pond reasonably appeared to be the best course of action, which it diligently pursued. It actually appears as if plaintiffs never alerted the City to their belief that an in-stream pond would not be permitted when they had an opportunity to comment. Reply at p. 10 n.4. Summary judgment is therefore granted as to this issue.

**E. Salmon Habitat Enhancement Projects on the Weinsteins' Property**

Plaintiffs contend that the City has violated its duty to "cooperate" with their attempts to obtain a permit for various improvements, including a "Salmon Habitat Enhancement Project," on the Weinsteins' property at the mouth of Coal Creek. The City has refused to permit the project. As the Court has repeatedly explained, the Court has no jurisdiction to evaluate any city permitting decisions regarding the Weinsteins' property apart from those detailed in the Settlement Agreement—which exist *solely* in the following provisions:

> <u>The Project</u>: Weinstein may design, obtain permits for, construct and maintain a salmon habitat enhancement project(s) ("SHEPs") in, on, and around the Weinstein Property . . . The cost of constructing, operating and maintaining such SHEPs will be at Weinstein's sole cost and expense.
>
> <u>Non-Opposition</u>: Subject to any such SHEPs complying with applicable Bellevue City Code provisions, the City and County shall not oppose Weinstein's development of any SHEPs in and around the Weinstein Properties at the mouth of Coal Creek.
>
> <u>City Permitting</u>: the City may charge Weinstein only reasonable and ordinary permitting costs. Subject to the SHEP permit(s) complying with applicable provisions of the Bellevue City Code, the City shall cooperate with Weinstein in securing such permits. . . . Subject to applicable provisions of the Bellevue City Code, the City shall defer to the review,

ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT - 10

> recommendations and determinations of other permitting agencies in evaluating Weinstein's permit applications.

Settlement Agreement ¶¶ 7.1, 7.2, 7.4.  There are two issues for the Court's consideration: (1) whether a particular project on the Weinsteins' property is a "salmon habitat enhancement project," triggering these paragraphs; and (2) whether the City "cooperated" in permitting.

### 1. Salmon Habitat Enhancement Project

Taking the facts in the light most favorable to plaintiffs, the Weinsteins have built a "water purification plant that provides clean, oxygenated water suitable for juvenile salmon, a salmon egg incubation box, a pond in which salmon alevins[4] can grow safe from predation, and streams through which the juvenile salmon can access the pond and, eventually, Coal Creek and Lake Washington."  Plaintiffs' Opposition at p. 8.  The purpose of the project is salmon egg incubation and alevin rearing.  Weinstein Decl. at ¶ 6 (Dkt. #87).

The City argues that the project is not a "salmon habitat enhancement project," and therefore is beyond the scope of the Settlement Agreement.  It also argues that the project is out of compliance with Bellevue city code—thus, even if what the Weinsteins built was a "SHEP," the City was released from any obligation to "cooperate" in permitting by the explicit condition precedent in the Settlement Agreement.

The term "salmon habitat enhancement project" is not defined in the Settlement Agreement; thus, the Court again turns to the dictionary and ordinary canons of construction.  "Habitat" is defined as "the region where a plant or animal naturally grows or lives; native environment . . . the place where a person or thing is ordinarily found."  WEBSTER'S THIRD NEW WORLD DICTIONARY 604 (1988).  "To enhance" is "to make greater, as in cost, value, or attractiveness, etc.; heighten; augment; to improve

---

[4] An alevin is a newly hatched salmon that is still attached to the yolk sac.

ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT - 11

the quality or condition of." Id. at 451. Although plaintiffs repeatedly do so, the Court cannot write the word "habitat" out of the term "Salmon Habitat Enhancement Project." Farmers Ins. Co. of Wash. v. Miller, 87 Wn.2d 70, 73 (1976) ("the court cannot rule out of the contract language which the parties thereto have put into it"). The Court further must find that "enhancement" modifies the entire phrase that comes before it—"salmon habitat." Cf. Ford Motor Co. v. City of Seattle, Executive Servs. Dep't, 160 Wn.2d 32, 48 (2007) (construing a phrase to modify the words that immediately preceded it). Thus, in order to be covered by the Settlement Agreement, the project on the Weinsteins' property must have improved the *place* where salmon is ordinarily found.

It is plain from the undisputed facts, taken in the light most favorable to plaintiffs, that the Weinsteins did not create a "salmon habitat enhancement project." Plaintiffs did not improve upon a *place* where salmon are ordinarily found. Instead, they created an incubation habitat on their property where young salmon may be hatched and reared. It may enhance *salmon* to make more of them; it does not, however, enhance salmon *habitat*. The project that the Weinsteins actually built creates an artificial area to raise and subsequently introduce young salmon. It does not improve any area where salmon naturally occur, and does not therefore enhance salmon habitat.

Because the Weinsteins did not build a "salmon habitat enhancement project," the project that they built was outside the scope of the Settlement Agreement, and the Court has no jurisdiction to weigh in further. The Court therefore need not—indeed, cannot—opine regarding whether the project constitutes a "hatchery," which would render it out of compliance with relevant Bellevue city codes.

**2. Cooperation**

Arguably, the City was under a duty to cooperate in the *process* of permitting, before the City determined that the project that the Weinsteins built was not a SHEP.

ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT - 12

See Settlement Agreement ¶ 7.4.  Apparently, the Weinsteins applied for, and procured, a series of permits in 2006 for plans to enhance salmon habitat.  See, e.g., Spencer Decl. at ¶ 17 (Dkt. #64).  The project that the Weinsteins actually constructed was substantially different from what was originally permitted, however.  *See* Equivalency Analysis at p. 10 (Dkt. #87-2) (expert analysis explained that the project "was constructed with several deviations from approved plans").  The City reacted to the substantial differences by requiring the Weinsteins to retain Bill Way, the City's salmon stream consulting expert, to conduct an "equivalency analysis" to see whether the deviations were material.  See Plaintiffs' Opposition at p. 9.  He concluded that "the deviations from approved plans provide an equivalent level of environmental protection."  Equivalency Analysis at p. 10.  The City apparently took this analysis under advisement, but disagreed with many of its conclusions and harbored additional concerns about the project's compliance with City codes.  The City required more information before making a final determination, but welcomed additional collaboration.  Drews Letter at pp. 1, 10–11 (Dkt. #87-2).  At some point thereafter, the City concluded that the project did not comply with applicable codes, and negotiations broke down; the City declined to participate in mediation before the instant lawsuit was brought.  See Bellevue Letter (Dkt. #87-2 at p. 123).  There is no material dispute of fact in this chain of events; the parties merely dispute whether these actions constituted "cooperation."

"To cooperate" means "to act or work together with another . . . for a common purpose."  WEBSTER'S THIRD NEW WORLD DICTIONARY 306 (1988).  The Court finds that the City worked together with the Weinsteins for the common purpose of creating a Salmon Habitat Enhancement Project, as evidenced by the fact that they did, in fact, issue permits for such a project, and by the letter correspondence on file between the City and the Weinsteins.  The failure to issue post-hoc permits was not a breakdown of

ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT - 13

"cooperation"—instead, it was a direct result of (1) the Weinsteins building a project that was substantially different than the permits for which they applied; (2) the City believing that the project actually built violated its city code; and (3) the simple fact that the completed project was not a SHEP. The Court cannot find that the City had an obligation to adopt the equivalency analysis wholesale, even when harboring significant, rational misgivings about that analysis' methodology. Nor did the City have any obligation to permit a project that was out of compliance with its codes. In fact, such an action would run counter to the case law of this State and create a void, *ultra vires* contract. South Tacoma Way, LLC v. State, 146 Wn. App. 639, 650 (2008). Summary judgment is therefore granted as to this issue.

**F. Counterclaim: the Flood Control Berm**

The City moves for summary judgment on its counterclaim against the Weinsteins, who contracted to "design, obtain permits for, construct, and maintain a flood control berm on the Weinstein Property along the south bank of Coal Creek." Settlement Agreement ¶ 6.1. The Weinsteins allege that their failure to build the berm is a result of the fact that the City blocked permitting for the SHEP; the Settlement Agreement explicitly provides for bundled permitting, and the Weinsteins' obligations are contingent upon their receipt of the required permits. However, plaintiffs misread the agreement's contingency paragraph. The relevant provision provides:

> Permitting: Weinstein's obligations [to build the berm] are contingent upon receipt of all third party permits and approvals for the Berm and Salmon Channel. Weinstein may combine the permitting and design for the Berm and Salmon Channel . . . with the permitting and design for the [SHEP] set forth in Section 7 below.

Id. at ¶ 6.3. As that provision makes clear, the Weinsteins' obligation to build the berm was contingent only upon their receipt of the permits for the berm and salmon channel. It was *not* contingent on their receipt of permits for the SHEP. The City permitted the

ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT - 14

flood control berm in 2006. See Taylor Decl. at ¶ 15 (Dkt. #65). The condition precedent is satisfied. To the extent that plaintiffs argue that the City's refusal to permit the salmon project constituted a breach so material as to excuse plaintiffs from performance, the argument fails because, as described above, the City did not breach those obligations. Summary judgment is therefore granted as to this issue.

## II.   CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment (Dkt. #61) is GRANTED.[5] The Clerk of the Court is directed to enter judgment in favor of defendant and against plaintiffs.

DATED this 26th day of March, 2010.

*signature*

Robert S. Lasnik
United States District Judge

---

[5] Plaintiffs argued, for the first time in response to the motion for summary judgment, that the City failed to confer with plaintiffs regarding changes to the CCSP. Plaintiffs' Opposition at p. 20. That contention is not in the Amended Complaint. It is therefore not properly presented to the Court and is insufficient to resist summary judgment.

ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT - 15