UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| NEWPORT YACHT CLUB, a Washington nonprofit corporation, individually and on behalf of its members; WILLIAM S. WEINSTEIN and LEANNE C. WEINSTEIN, and their marital community,<br><br>Plaintiff,<br><br>v.<br><br>THE CITY OF BELLEVUE, a Washington municipal corporation,<br><br>Defendant. | CASE NO. C09-0589-MJP<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

This matter came for trial on March 5-12, 2012, before the Court, sitting without a jury. Plaintiff Newport Yacht Club appeared through its attorney, Lawrence M. Kahn. Plaintiffs William S. Weinstein and Leanne C. Weinstein appeared through their attorneys, Spencer Hall and Arthur C. Claflin. Defendant City of Bellevue appeared through its attorneys, Elaine L. Spencer and Cheryl A. Zakrzewski.

The Court has considered the testimony presented at trial, the exhibits admitted into evidence, and the arguments of counsel. The Court also visited the area around Coal Creek with Plaintiffs' and Defendant's counsel on February 28, 2012, and viewed 21 sites that had been preselected by the parties. (Dkt. No. 205.)

The Court now makes the following findings of fact and conclusions of law:

**I.    FINDINGS OF FACT**

### Background Facts

1. This dispute arises out of a suit brought by Plaintiffs Newport Yacht Club and William S. and Leanne C. Weinstein against the City of Bellevue and King County, Washington, Cause No. C03-2534Z ("2003 Action"), alleging violations of the Clean Water Act and other statutes relating to the City and County's design and management of stormwater and sedimentation facilities in the Coal Creek basin.

2. Coal Creek is a stream that descends from Cougar Mountain through Coal Creek Park and through the Bellevue community of Newport Shores into Lake Washington.

3. Coal Creek once sustained a viable salmon run, but development and sedimentation have largely eliminated salmon in the creek. The water in Coal Creek contains coal mine tailings and is a challenging environment for juvenile salmon.

4. Plaintiffs William and Leanne Weinstein own two parcels of land that straddle the mouth of Coal Creek at 73 and 75 Skagit Key.

5. Plaintiff Newport Yacht Club is the homeowners association for the Newport Shores community. The members of the Newport Yacht Club have a longstanding interest in the return of salmon to Coal Creek.

6. The 2003 Action was brought after the City of Bellevue concluded it would not go forward with a flood control plan that had been proposed ("Spearman Option 7"), which called for the City to dig a large sediment settling basin at the mouth of Coal Creek, from which the City could excavate sediment every few years.

**Procedural Context**

7. The 2003 Action was dismissed with prejudice, and in August 2004, the parties entered into a Settlement Agreement. The district court retained jurisdiction to enforce the Settlement Agreement.

8. In the Settlement Agreement, among other provisions, the City of Bellevue agreed to implement a Coal Creek Stabilization Project (§ 4), the Weinsteins agreed to construct a flood control berm (§ 6), the parties agreed that the Weinsteins could build one or more salmon habitat enhancement projects ("SHEPs"), so long as the projects complied with the Bellevue City Code (§ 7), and the City and County agreed to pay specified amounts to the Newport Yacht Club for dredging (§ 11).

9. The Settlement Agreement included a provision that, in any action to enforce the Settlement Agreement, the prevailing party will be awarded its reasonable attorney fees and costs, as determined by the court (§ 16).

10. In April 2009, Plaintiffs Newport Yacht Club and the Weinsteins filed the present lawsuit alleging that the City failed to fully implement the stabilization project, failed to cooperate with respect to a salmon habitat enhancement project, and wrongfully retaliated against the Weinsteins by thwarting or delaying issuance of permits relating to the Weinsteins' residence.

11. In October 2009, Judge Coughenour dismissed all tort claims and all claims related to the Weinsteins' house. Judge Coughenour ruled that the Court's ancillary jurisdiction was limited to enforcing only rights specifically created in the contract.

12. In February 2010, the case was reassigned to Judge Lasnik, and in March 2010, Judge Lasnik granted summary judgment in favor of the City on all claims. Judge Lasnik found that the City had reached its budget cap under the source control provisions, that the City did not violate its duty of good faith and fair dealing regarding its obligation to increase sediment capture capacity, and that the City did not violate its obligations regarding the SHEP because the Weinsteins' project did not constitute a SHEP. Specifically, Judge Lasnik concluded that the project was not a "salmon habitat enhancement project" because "Plaintiffs did not improve upon a place where salmon are ordinarily found."

13. In July 2010, Judge Lasnik granted the City $33,573.90 in costs and $401,070 in attorney's fees pursuant to § 16 of the Settlement Agreement. (Dkt. No. 141.) Upon Plaintiffs' posting a supersedes bond, Judge Lasnik stayed execution of the judgment and fee award pending appeal. (Dkt. No. 143.) The attorney's fees award was not appealed. (Dkt. Nos. 125, 128.)

14. On appeal, the Ninth Circuit affirmed the district court's summary judgment order on the issues of the source control budget cap, the sediment capture capacity, and the flood control berm, but reversed the summary judgment order regarding the SHEP. The Ninth Circuit held that the phrase "salmon habitat enhancement project" is subject to more than one reasonable meaning, and the mutual intent of the parties remains a question of fact to be determined at trial.

15. In November 2011, this Court denied the City's motion for summary judgment, ruling that there were three remaining issues for trial: (1) whether the Weinsteins' project is a SHEP, as

the term was intended by the parties in the 2004 Settlement Agreement; (2) whether the Weinsteins' project complies with applicable Bellevue Code provisions, triggering the City's duties of cooperation and non-opposition under the Settlement Agreement; and, if so, (3) whether the City has cooperated and not opposed the project, as required by the Settlement Agreement.

### Negotiation of the 2004 Settlement Agreement

16. In June and July 2004, representatives of Weinsteins, the Newport Yacht Club, King County, and the City of Bellevue met to discuss potential settlement of the claims brought in the 2003 Action. The parties used a mediator who engaged in "shuttle diplomacy" between the two sides.

17. In the negotiations, Plaintiffs at first pressed for the City to agree to undertake Spearman Option 7, and commit to periodic dredging of the settling basin. When it became clear that option would not be granted the necessary aquatic permits, the proposal surfaced that a combined flood control berm and salmon channel be constructed to protect against flooding and to assist salmon migrating up Coal Creek by deepening the channel at the mouth of the Creek.

18. During this time, the parties exchanged various draft Settlement Agreements, which discussed the construction of salmon enhancement facilities on the Weinsteins' property.

19. In the course of the negotiations, the parties were aware of other salmon enhancement projects in the Bellevue area, including protected on- or off-stream ponds and egg boxes.

20. In the course of these negotiations, the parties created the term "salmon habitat enhancement project" ("SHEP"). The parties did not have an explicit definition of "salmon habitat enhancement project" in mind. Instead, they believed that a SHEP may include a number

of different types of salmon projects, similar in scope to the salmon projects that had been underway in Bellevue for many years.

21. The parties intended that "habitat enhancement" could include a variety of actions that improve or increase salmon habitat, such as egg boxes and protected on- or off-stream ponds.

22. The parties to the negotiations envisioned habitat enhancement on raw land, not development of an area adjoining a house.

23. During the settlement negotiations, Newport Yacht Club's sole intent with regard to 75 Skagit Key was to see that it was used to restore salmon habitat, not to have a house built on the property.

24. Following the negotiations, the City of Bellevue was open to approving any plan, complying with the Bellevue City Code, that the Weinsteins may have submitted regarding what would have constituted a SHEP.

**Compliance with Bellevue City Code**

25. The Weinsteins' property at 75 Skagit Key contains one of the few remaining Type A wetlands within the City of Bellevue.

26. Under the Critical Areas chapter of the Bellevue City Code, any development on 75 Skagit Key is subject to a 50-foot primary setback, or buffer, from both the wetland bordering Lake Washington and from Coal Creek, and a 25-foot structure setback beyond those buffers.

27. Under the Bellevue City Code, more than 90 percent of 75 Skagit Key is protected wetland, wetland and riparian buffer, and structure setback.

28. The Bellevue City Code prohibits development, use, land alteration, or activity within the critical area and its primary setback, except as specifically allowed by Part 20.25H of the Land Use Code.

29. The Bellevue City Code provides for a reasonable use exception to avoid a regulatory taking when 90 percent or more of a property is protected from disturbance under the Code. The reasonable use exception is called a "Protected Area Development Exception," or PADE.

30. Under a PADE, the City may permit disturbance of not more than 10 percent of a lot for a structure or other land alteration (such as grading, utility installation, or landscaping), so long as the intrusion into the protected areas is the minimum necessary to allow "reasonable use" of the property and adverse impacts to the protected areas are mitigated as set forth in the PADE.

**Weinsteins' Prior Opposition to Construction on 75 Skagit Key**

31. In 2001, the Weinsteins publicly opposed the PADE application filed by their predecessor, John Yonich, who owned 75 Skagit Key at that time.

32. In opposing the Yonich PADE application, the Weinsteins took the position that, because it was encumbered by wetland, the only uses that should be allowed to be made of 75 Skagit Key were turning it into a park or creating a haven for salmon by constructing a habitat enhancement project. This was the Weinsteins' stated intent to the City while the negotiations were conducted in 2004.

33. Despite the Weinsteins' objections, the City issued a PADE for 75 Skagit Key in January 2002, permitting development on 10 percent of the lot, or 3,835 square feet.

34. Condition 9 of the PADE explicitly required that any impact to the wetland protected area be mitigated.

## Weinsteins' Construction on 75 Skagit Key

35. After the City approved the PADE application, the Weinsteins purchased 75 Skagit Key from John Yonich.

36. In January 2005, William Weinstein met with the U.S. Army Corps of Engineers and various state agencies to discuss the construction of a stream channel and bank structure to reduce flooding. The proposal Weinstein presented emphasized developing natural habitat, not creating artificial habitat.

37. In November 2005, the Weinsteins applied for a building permit to build a house on 75 Skagit Key. The total footprint of the proposed house, including the driveway, footbridge, and paths, was 3,998 square feet—more than the 3,835 that the PADE allowed.

38. The Weinsteins argued, and the City accepted, that the total disturbance area under the PADE should be increased to 4,000 square feet, because sediment deposition had increased the size of the upland portion of 75 Skagit Key to 40,000 square feet.

39. Until the time when the Weinsteins applied for a permit to build a house on 75 Skagit Key in November 2005, they never informed the City that they had any intention other than preserving it as a natural area or using the entire property as part of a salmon enhancement project.

40. The Weinsteins' application for a building permit originally did not include the mitigation plan required by condition 9 of the PADE.

41. To correct this omission, in June 2006, the Weinsteins submitted a "Parcel Development and Natural Areas Enhancement Plan," which described how the Weinsteins would comply with the mitigation activities required under the PADE. Specifically, the plan called for the planting of 10 trees, more than 35 shrubs, and nearly 1000 native groundcover plants. The

1 plan also included a small, shallow pond, which would be planted with emergent water plants

2 and surrounded by dense native shrubs.

3     42. In 2006, the Weinsteins also submitted a shoreline substantial development permit

4 application to construct the flood control berm on 73 Skagit Key and the salmon channel

5 required by §§ 6.1 and 6.2 of the Settlement Agreement. The city conducted its normal review

6 process and on Nov. 2, 2006, issued the shoreline substantial development permit for the salmon

7 channel and flood control berm.

8     43. In January 2007, the City approved the permit for the Weinsteins to construct a house

9 on 75 Skagit Key, subject to compliance with the PADE and the Parcel Development and

10 Natural Areas Enhancement Plan.

11     44. The Weinsteins built the house on 75 Skagit Key during 2007 and 2008, but the

12 project deviated from the Parcel Development and Natural Areas Enhancement Plan in a number

13 of ways. It included a 1,164 square foot deck around the perimeter of the house, 907 square feet

14 of sidewalks, and a 2,671 square foot pond, in violation of the conditions of the building permit.

15 **Weinsteins' Salmon Project**

16     45. In 2007 and 2008, the Weinsteins constructed a pond for raising juvenile salmon

17 between their house and the wetland.

18     46. The Weinsteins' pond was both larger and deeper than the approved pond in the

19 Parcel Development and Natural Areas Enhancement Plan.

20     47. The project also included a well and purification plant to provide clean, oxygenated

21 water for the salmon, streams feeding into the pond, and a means for releasing the juvenile

22 salmon into Coal Creek and Lake Washington.

23

24

48. The Weinsteins filled the area around the pond, installed a sod grass lawn around the pond, and installed non-native ornamental plantings.

49. Further, the Weinsteins installed a synthetic-lined ditch to discharge overflow water from the pond directly into Coal Creek rather than to allow overflow to disperse into the wetland, as required by the Parcel Development and Natural Areas Enhancement Plan.

50. The discharge ditch crossed not only the riparian setback but also the mapped wetland, in violation of the Parcel Development and Natural Areas Enhancement Plan. The fill for the lawn also extended into the mapped wetland.

51. In short, what was built disturbed and invaded the wetland.

### Code Enforcement

52. The Bellevue City Code makes it illegal for any person to use property in violation of the provisions of the City's land use code. LUC 20.40.450.

53. When the City learned in 2008 that the house on 75 Skagit Key did not comply with the plans submitted, the City asked the Weinsteins to submit a report about whether what they actually installed was functionally equivalent to the PADE in terms of its capacity for wetlands preservation and enhancement.

54. In response, the Weinsteins submitted an Environmental Equivalency Report concluding that, by supporting the introduction of juvenile salmon into Coal Creek, the development as built had an environmental value equivalent to preserving the wetland. The City rejected the report because it did not adequately address the issue of mitigating the impact on the protected wetland as required by the PADE.

55. The City refused to issue an occupancy permit for the house.

56. In June 2010, the City and the Weinsteins entered into a Voluntary Correction Agreement ("VCA"), which required the Weinsteins to remove most of their deck, reduce the size and depth of their pond, and replace all non-native plants.

57. The 2010 VCA required the Weinsteins to remove the egg box and to cover the stream on the South side of their pond, which had been part of the salmon project.

58. The Weinsteins made the corrections required by the VCA, and the City issued an occupancy permit for the house.

59. After the development had been revised to comply with the VCA, the total disturbance of 75 Skagit Key was 4,905 square feet, or 22.6 percent more than allowed under the PADE.

60. In entering the VCA, the development on 75 Skagit Key did not come into compliance with the City Code, because the disturbance still exceeded the total disturbance permitted under the PADE.

61. The City agreed to VCA because it determined that requiring the Weinsteins to remove all the offending structures would cause more disturbance than allowing some of the structures to remain.

62. Since entering into the VCA, neither the Weinsteins nor the Newport Yacht Club have made an application for any permits related to a salmon project on 75 Skagit Key.

**Status of the Egg Box**

63. The egg box that had been on 75 Skagit Key was removed by the Weinsteins as a condition of the VCA.

64. LUC 20.10.420.A provides that the Director of Planning and Community Development is responsible for determining permissible uses of property. The Director of

Planning and Community Development has delegated this authority to the Land Use Director, Carol Helland.

65. While the City has taken the position that the Weinsteins' salmon project is a "hatchery" as part of the present litigation, the parties have never gone through the process of presenting a plan, working through a planning process, making a decision, or any of the steps of review outlined in the Bellevue City Code.

65. The Weinsteins never submitted any permit application with respect to their stated desire to place an egg box in the pond, under the pond, or floating on top of the pond.

## II. CONCLUSIONS OF LAW

1. This Court has ancillary jurisdiction to enforce the Settlement Agreement, which the Court retained in entering the order approving the Settlement Agreement and dismissing Cause No. C03-2534Z with prejudice.

2. Venue is proper in the Western District of Washington.

3. Construction and interpretation of the Settlement Agreement is a matter of Washington law. Where the language of a contract is ambiguous, the Court is permitted to determine the intent of contracting parties from extrinsic evidence, including the relations of the parties, their prior negotiations, and their course of dealing. Berg v. Hudesman, 115 Wn.2d 657 (1990).

4. The salmon project that the Weinsteins built was not a SHEP within the meaning of what the parties intended in the Settlement Agreement, because the parties envisioned a project to enhance the natural land, constructed or complementing the Code restrictions already in place to protect the wetland.

5. The Weinsteins ceased to act on the original intent of the parties regarding the SHEP when they chose to use and then exceed all of the available development envelope for a large home rather than a SHEP.

6. The salmon project the Weinsteins built violates the Bellevue City Code, because it grossly exceeds the disturbance limits and ignores the mitigation conditions imposed by the PADE in order to limit the negative effect on wetlands.

7. The salmon project the Weinsteins built further violates the Bellevue City Code because components of the project, including the pond, pipes, well, purification plant, and streams, are "structures," which under the Bellevue City Code cannot be erected within the wetland areas.

8. In short, the Weinsteins' salmon project is not a nonconforming use under the Bellevue City Code because it was never legal under the Code.

9. Sections 7.2 and 7.4 of the Settlement Agreement imposed an obligation on the City of Bellevue to approve permits for and cooperate in the permitting of a "salmon habitat enhancement project" on the Weinstein properties if, but only if, the proposed project complied with applicable Bellevue City Code.

10. Because the salmon project as built does not comply with the Bellevue City Code, the City does not have any duties under § 7 of the Settlement Agreement regarding the salmon habitat enhancement project.

11. The City has not "opposed" the SHEP project under the Settlement Agreement because no permit has ever been submitted for a SHEP that complied with the Bellevue City Code.

12. To qualify for any relief in a breach of contract action, including injunctive relief, the plaintiff must show a breach of contract. <u>Minnick v. Clearwire, U.S., L.L.C.</u>, 683 F. Supp.2d 1179, 1187 (W.D. WA 2010).

13. Because the City does not owe a duty to the Weinsteins to approve a project not in compliance with the Code, there is no breach of duty. Therefore, injunctive relief is inappropriate.

14. Rescission is inappropriate because, nearly eight years after the Settlement Agreement was signed, it is impractical to fully restore the parties to their position before the contract had been made. <u>See</u> <u>Yount v. Indianola Beach Estates</u>, 63 Wn.2d 519, 525 (1964).

15. Plaintiffs' claims under § 7 of the Settlement Agreement are hereby dismissed.

16. The City of Bellevue is the prevailing party in this litigation, and it shall recover its costs and attorney fees in this action, pursuant to § 16 of the Settlement Agreement.

17. The judgment for fees and costs that was previously entered by Judge Lasnik (Dkt. No. 141) is reaffirmed. The City shall recover from the Weinsteins and from Newport Yacht Club its additional costs and attorney fees incurred in this proceedings, the amount to be determined by subsequent motion.

The clerk is ordered to provide copies of this order to all counsel.

Dated this 23rd day of March, 2012.

_____
Marsha J. Pechman
United States District Judge